UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; and ALLSTATE
PROPERTY AND CASUALTY INSURANCE
COMPANY,

                Plaintiffs,

v.

NORTHLAND RADIOLOGY, INC.;
PIONEER LAB HOUSTON LP; MILAN
GANDHI; and BENJAMIN KRPICHAK,

                Defendants.

C.A. No. _____

**Demand for Jury Trial**

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.    INTRODUCTION

1.    This is a case about a medical clinic and magnetic resonance imaging ("MRI") facility and a drug testing laboratory that abused the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting false and fraudulent medical records, bills, and invoices through the U.S. Mail and interstate wires seeking payment under the No-Fault Act

1

for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were billed at excessive rates.

2. Defendants Northland Radiology, Inc. ("Northland"), Pioneer Lab Houston LP ("Pioneer"), Milan Gandhi ("Gandhi"), and Benjamin Krpichak ("Krpichak") (collectively, the "defendants") conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3. The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to the defendants.

4. All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5. By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by the defendants are compensable.

6. As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to the defendants related to the patients at issue in this Complaint.

II.    **THE PARTIES**

A.    PLAINTIFFS

7.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

8.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

9.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

B.    DEFENDANTS

1.    **Northland Radiology, Inc.**

10.    Defendant Northland Radiology, Inc. is incorporated under the laws of the State of Michigan.

11.    Northland's principal place of business is in Southfield, Michigan.

12.    At all relevant times, Northland was operated and conducted by defendants Pioneer, Gandhi, and Krpichak.

13.    Northland billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

### 2. Pioneer Lab Houston LP

14. Defendant Pioneer Lab Houston LP is a limited partnership formed and existing under the laws of the State of Texas.

15. Pioneer was authorized to do business in Michigan under the assumed name of Pioneer Lab Houston Partnership on September 2, 2021.

16. The general partner of Pioneer is SP Healthcare Holding LLC, a limited liability company organized under the laws of the State of Texas.

17. SP Healthcare Holding LLC's member is Sourabh Sanduja, who is a citizen of the State of Texas.

18. Pioneer's principal place of business is in Baytown, Texas.

19. At all times relevant to the allegations set forth herein, Pioneer intentionally sought to and did do business in the State of Michigan, including with respect to the conduct discussed herein.

20. At all relevant times, Pioneer was operated and conducted by defendants Northland, Gandhi, and Krpichak.

21. Pioneer billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 2.

### 3.   **Milan Gandhi**

22.     Defendant Milan Gandhi is a resident and citizen of the State of Michigan.

23.     At all times relevant to this Complaint, Gandhi operated and controlled defendants Northland and Pioneer.

### 4.   **Benjamin Krpichak**

24.     Defendant Benjamin Krpichak is a doctor and a resident and citizen of the State of Michigan.

25.     At all times relevant to this Complaint, Krpichak operated and controlled defendants Northland and Pioneer.

## III.   **JURISDICTION AND VENUE**

26.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

27.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

28.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

29.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

30.    The defendants used the RICO enterprises discussed herein (namely, Northland and Pioneer) to submit exorbitant charges to Allstate for purported medical services, procedures, imaging, and testing that were not actually provided, were not medically necessary, were fraudulently billed, and were billed at excessive and unreasonable rates.

31.    The purpose of the scheme was to generate as many bills as possible, without regard for medical necessity or patient safety, which bills were sent to Allstate using the U.S. Mail and interstate wires.

32.    Northland is layperson owned and operated in violation of Michigan law, and its primary purpose is to generate as many bills as possible as quickly as possible rather than to render reasonable and necessary patient-specific treatment in accordance with applicable standards of care.

33.    Patients were often referred to Northland by personal injury attorneys who were aware that Northland would immediately generate massive amounts of bills and therefore increase the perceived value of insurance claims made against Allstate.

34.     As one example illustrating how patients were directed to present to Northland, the case manager for B.K. (Claim No. 0634973951)[1] recorded the following about why B.K. ceased treating with one pain management physician and presented to Northland:

> [B.K.] called to inform me his attorney wants another provider on the case; reports not knowing what kind of provider it is but wanting me to call it.  I informed him I was going to call the attorney to figure out the plan of care . . . .

35.     The "provider" referenced in the excerpt above was Northland and, as documented by the excerpt, B.K.'s attorney directed not only the physician who would bill for alleged pain management services but also was involved in setting the "plan of care."

36.     Northland then went on to generate more than $111,000 in charges relative to B.K. that were improper, excessive, unnecessary, and not performed for the reasons detailed below.

37.     Similarly, L.C. (Claim No. 0703140251) testified that he was referred to Northland by his personal injury attorney, and Northland subsequently generated more than $200,000 in bills for excessive and unnecessary alleged services.

---

[1] To protect the confidentiality of its insureds, Allstate refers to them herein by initials and Allstate claim number.  The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

38.     These patients (along with all patients identified by initials and claim numbers herein) are merely representative examples as it was routine for patients to retain certain attorneys and immediately be referred to Northland where tens of thousands of dollars of bills (and often more) were generated within days.

39.     These enormous bill amounts – which were the reasons for referrals to Northland – were generated by incredibly excessive and unnecessary services such as MRIs, drug testing, and injections, all of which are discussed in detail below.

40.     The purported evaluations at Northland, and the orders for the unnecessary tests and services described herein, were most frequently signed by defendant Krpichak pursuant to a predetermined protocol instituted by defendant Gandhi.

41.     Northland conspired with Pioneer to multiply charges to Allstate by generating charges for alleged drug testing that served no medical purpose.

42.     Pioneer could not bill Allstate for any services without the participation of Northland as it required a physician to sign a prescription in order to bill for alleged drug testing.

43.     In exchange, Pioneer generated records that created the appearance that patients had more serious conditions and treatment than they actually did and provided purported justification for Northland to continue prescribing medications that were billed at exorbitant rates by its associates.

44.     The inseparable relationship between Pioneer and Northland is confirmed by the fact that more than 95% of the patients at issue herein for whom Pioneer billed Allstate were also patients of Northland.  *See* Exhibits 1 and 2.

45.     Northland also confirmed to Allstate that all specimens obtained by it are sent to Pioneer and that sending specimens to Pioneer is the "standard" for the clinic.

46.     As detailed below, the defendants worked together and with associated providers and individuals (such as attorneys and case managers) to use several different methods to submit fraudulent bills to Allstate for services that were unlawful, that were never compensable, and that were not actually performed at all.

47.     The defendants' bills and associated records were sent to Allstate through faxes over interstate wires and the U.S. Mail, and Allstate relied on the faxes and mailings sent by the defendants in adjusting and paying insurance claims.

## V.     BILLING FOR SERVICES NOT RENDERED

48.     The defendants' pervasive conduct in mailing and faxing demands for payment to Allstate for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

49.     All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for treatment that never occurred are fraudulent.

50.     Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

A.     **BILLING FOR IMAGING NOT PERFORMED**

51.     Northland operates as a stop on a mobile MRI route and alleged imaging is performed in the trailer depicted below:



52.     Northland bills extraordinary amounts for each MRI it allegedly performs, and therefore had a financial motivation to order as many MRIs as possible for each patient.

53.     The incredible lack of medical necessity and violation of standards of care of these MRI orders is addressed in detail below, but Northland also did not actually perform all of the imaging studies for which it billed.

54.     Patients have confirmed through testimony that they did not actually undergo all of the incredible number of MRIs billed by Northland.

55.     For example, S.I. (Claim No. 0665311874) testified that she had one (1) MRI and two (2) CT scans performed at Northland.

56.     As of the date of her testimony, Northland had billed Allstate for at least eleven (11) separate MRIs on three (3) separate dates.

57.     On March 22 and 23, 2023, Northland billed for an outrageous fourteen (14) separate MRIs of B.W. (Claim No. 0709342653) after evaluating him just once.

58.     B.W. testified about his MRIs as follows:

Q: Did you go to 13 different MRIs?  Did you have 13 different MRIs done?

A: No, I only had one done.

59.     B.W. further explained that he believed he had a single scan of his entire body.

60.     Even if Northland actually performed such a full body scan, which would be exceptionally inappropriate for B.W.'s (or any other patient at issue herein) presentation, it could only have appropriately billed for the single service that it was and not fourteen (14) separate MRIs that were not actually performed.

11

61.     Similarly, Northland billed for fourteen (14) separate MRIs of D.T. (Claim No. 0719279945) on September 29, 2022, which was also the first date she presented to the clinic.

62.     Fourteen (14) separate MRIs would take approximately seven (7) hours to perform and the patient would need to be repositioned between each scan.

63.     In other words, having fourteen (14) MRIs on the same date would be a memorable experience.

64.     When D.T. was asked about this excessive number of MRIs during deposition testimony she could not recall for sure if she had even a single MRI at Northland.

65.     Northland also billed for epidurograms that were not actually performed in connection with its excessive and unnecessary pain management injections.

66.     An epidurogram is a procedure that involves injecting dye into the area to be injected to obtain information about the patient's anatomy before a procedure.

67.     Epidurograms are rarely necessary, particularly when a patient has already had imaging done of the area to be injected.

68.     Because Northland billed for imaging every area of every patient's body (in clear violation of the standard of care), epidurograms were never necessary for patients at issue herein.

69.     Further, when Northland billed for epidurograms, they were not actually performed.

70.     To bill for an epidurogram, the record must, at a minimum, contain a radiologic report describing the performance of the purported imaging.

71.     Northland never generated such a report and never actually performed the epidurograms billed to Allstate.

**B.     BILLING FOR DRUG TESTING NOT PERFORMED**

72.     The defendants conspired to order and bill for an outrageous amount of drug testing that served no medical purpose, as detailed below.

73.     Like the excessive and unnecessary imaging at issue herein, much of the drug testing ordered and billed by the defendants was not done at all.

74.     Also like the imaging not actually performed addressed above, patients have testified that they did not actually provide specimens that were claimed to be tested by Pioneer.

75.     For example, P.M. (Claim No. 0698422565) testified that she recalled providing urine specimens for certain of her providers but that she did not recall providing a urine specimen at all at Northland.

76.     Pioneer nevertheless billed for testing a urine specimen that was allegedly collected at Northland on December 23, 2021 (and was submitted with a forged requisition/prescription form, as discussed further below).

77.     While the majority of the alleged drug testing at issue herein was claimed to have been performed on urine specimens, on many occasions the defendants claimed to collect specimens of saliva via oral swab instead.

78.     Saliva cannot be tested in all the same ways as urine, but Pioneer nevertheless billed for the same unnecessary battery of tests regardless of what type of specimen was allegedly obtained.

79.     For example, on May 28, 2021, Pioneer billed for alleged creatinine and pH testing of a specimen collected via oral swab from M.E. (Claim No. 0612994285).

80.     Pioneer did not actually report test results for creatinine and pH, nor could it have done such tests on this type of specimen.

81.     Even when Pioneer claimed to perform tests for these substances on urine specimens, it did not actually include results of such testing on its laboratory reports, which evidences that the tests were not actually done (and certainly were not billable as no one recorded or conveyed the results).

82.     Pioneer also billed Allstate for allegedly testing both types of specimens for the presence of drugs and analytes that were not actually performed.

83.     For many of the specimens allegedly tested at issue herein, Pioneer billed Allstate using Healthcare Common Procedural Coding System ("HCPCS") code G0483, which describes testing at least twenty-two (22) different drug classes.

84.    Pioneer did not actually test anywhere close to twenty-two (22) different drug classes for each specimen.

85.    Pioneer's typical boilerplate laboratory report has just six (6) categories: amphetamines, benzodiazepines, tricyclic antidepressants and SSRIs, opiates/opioids, illicits, and other.

86.    Even if Pioneer was given the benefit of the doubt and the individual substances listed among the six (6) classes it self-identified that could conceivably be billed separately were counted separately, it still did not bill for at least twenty-two (22) separate drug classes.

87.    For example, on June 21, 2021, Pioneer billed for testing a specimen obtained from L.N. (Claim No. 0642286223) for at least twenty-two (22) separate drug classes.

88.    The purported results of this test were reported on Pioneer's typical boilerplate laboratory form using the six (6) self-identified classes above.

89.    Even when each individual drug and analyte that could be separately billed is counted, Pioneer only tested for at most twenty (20) drug classes.

90.    However, it is also important to note that Pioneer did not perform twenty (20) separate tests on this (or any) specimen; the methodology it claimed to use for testing involves just one test for all drugs and analytes, so Pioneer's

misrepresentation about the number of drug classes tested was done solely to increase the amount charged to Allstate.

91.    Because Pioneer used the same predetermined tests (that were unnecessary and in most cases not even actually ordered, as detailed below), the same billing for services not rendered exists for each claim seeking payment for billing code G0483.

92.    Further, in the example of L.N. above and numerous other patients at issue herein, Pioneer submitted a separate charge of an additional $1,000 for an alleged qualitative screen of the specimen that served no medical purpose.

93.    Like the phantom alleged specimen validity testing addressed above, no qualitative screen test results were actually recorded relative to L.N. and many other patients at issue herein and such testing was not actually done.

### C.    BILLING FOR SUBSTANCES NOT USED DURING PROCEDURES

94.    As detailed below, Northland regularly billed for excessive and unnecessary invasive procedures such as epidural steroid injections ("ESIs"), medial branch blocks ("MBBs"), and radiofrequency ablations ("RFAs").

95.    Each time Northland billed for these unnecessary procedures, it also fraudulently double billed for related and ancillary services (discussed further below), and often also for services and supplies that were not provided at all.

96.    Northland routinely billed for using injectate material in amounts far greater than was actually used.

97.    For example, on September 28, 2022, Northland billed for a procedure to L.N. (Claim No. 0642286223) that it claimed involved five (5) separate injections of .5 milliliters of a solution that included ten (10) milliliters of bupivacaine and twenty (20) milligrams of Kenalog.

98.    For the Kenalog, Northland billed $1,200 for allegedly using four (4) units of the substance at ten (10) milligrams per unit, which is twice as much Kenalog as was actually used for the solution and far more than was actually injected.

99.    Northland also billed $1,800 for the alleged use of three (3) units of ten (10) milligrams of lidocaine, which was not used at all.

### D.    BILLING FOR OTHER SERVICES NOT RENDERED

100.   In addition to the categories of billing for services not rendered addressed above, which were repeated for numerous patients at issue herein, the defendants also billed for services not rendered in unique ways.

101.   For example, in accordance with its predetermined treatment protocol (addressed further below), Northland billed for allegedly issuing durable medical equipment ("DME") to L.C. (Claim No. 0703140251) at his first appointment at the clinic on December 9, 2022.

102.   Specifically, Northland billed $2,400 for allegedly issuing a cane and back brace to L.C., but L.C. later testified that he never received any DME from Northland and that he reported to Northland that he did not receive any DME but Northland did nothing in response.

103.   Also in accordance with its predetermined protocol, Northland ordered excessive and improper procedures for L.N. (Claim No. 0642286223) and on June 7, 2022 billed for allegedly performing a right-sided joint injection.

104.   The procedure report submitted by Northland on that date does not describe a joint injection at all, but rather a radiofrequency ablation ("RFA") to L.N.'s right sacroiliac joint.

105.   Northland also did not perform the RFA, as evidenced by (1) a report from L.N.'s case manager on June 20, 2022 that L.N. on that date reported to Northland that her cervical epidural steroid injection – which is a completely different procedure to a completely different body part – was not successful and (2) Northland then billed for right-sided sacroiliac joint injections twice within the following three (3) weeks even though the procedure permanently cauterizes nerves and there is no reason to perform it more than once every six (6) months.

106.   To the extent that any service was performed to L.N. at all on June 7, 2022, it was neither the injection billed nor the RFA claimed by its medical record.

107.   Northland also billed for alleged patient evaluations that it did not actually perform, including with respect to L.N. on September 28, 2022.

108.   On that date, it was reported by the physician who allegedly performed the evaluation for which Northland billed that he encountered L.N. asleep on a stretcher after having undergone an RFA procedure to her cervical spine.

109.   This encounter of the physician finding L.N. asleep was billed as a level 3 patient evaluation, which would have required interaction and examination that could not have been and was not performed with L.N. asleep from the effects of anesthesia.

110.   Northland also cynically abused the public health crisis caused by the COVID-19 virus and submitted add-on charges to purported evaluations at $100 per visit for alleged supplies used to mitigate the spread of disease.

111.   These bills were often submitted in batches long after evaluations were performed and for which no additional supplies were actually used.

112.   As with all of the individual patient exemplars throughout this Complaint, these instances of billing for services not rendered are representative examples of the defendants' primary goals of submitting as many charges as possible, which routinely resulted in billing for services that were not actually performed.

## VI.   FALSIFIED AND FABRICATED RECORDS

113.   The defendants submitted altered, forged, and fabricated medical records in an effort to conceal their fraud and create the appearance of significant injury in order to support their charges submitted to Allstate for unnecessary services.

114.   Most egregiously, Northland and Pioneer routinely worked together to forge signatures on requisition/prescription forms for alleged drug testing.

115.   As detailed below, it was part of the defendants' predetermined protocol to bill for alleged drug testing of patients in connection with nearly every alleged evaluation billed by Northland, regardless of whether patients were prescribed medications susceptible to abuse or misuse (or, in some cases, prescribed medications at all).

116.   In order to create the appearance that physicians made orders for these clearly excessive and unnecessary drug tests, the defendants simply forged their names on requisition/prescription forms and used forms that were signed by physicians and then altered to create the appearance that separate tests had been ordered.

117.   For example, the following signature purporting to be from Krpichak was submitted to Allstate on a requisition/prescription for a urine drug test billed relative to R.C. (Claim No. 0709087449) on February 8, 2024:

118. The exact same signature was submitted on a requisition/prescription form for another urine drug test billed relative to R.C. on March 28, 2024:



119. As illustrated by the excerpts above, the signature on these forms was copied and pasted and only the dates were changed to create the appearance that a physician had actually ordered a new test.

120. The defendants also had more than one version of a requisition/prescription form with a pre-signed or copied and pasted physician signature, as the following identical signature was submitted on three (3) separate requisition/prescription forms relative to R.C. on November 9, 2023, December 7, 2023, and January 11, 2024:

121.  This same exact signature was also used on requisition/prescription forms sent relative to other patients, further confirming that the defendants simply had a blank or altered form bearing a signature that was copied and pasted numerous times over to falsely report to Allstate that medically unnecessary drug testing had been ordered by a physician.

122.  For example, the exact same signature was submitted on a requisition/prescription form relative to I.W. (Claim No. 0744636756) on January 15, 2024, as illustrated below:

123.   Krpichak has also testified that requisition/prescription forms ordering drug testing that was billed by Pioneer and which purported to bear his signature were not his handwriting and were not signed by him.

124.   Pioneer was undoubtedly aware that signatures were forged on requisition/prescription forms that originated at Northland, as a case it filed against Allstate was dismissed as a matter of law on January 12, 2023 by a decision in which the judge expressly recounted Allstate's unrefuted allegations that an alleged prescription for urine drug testing for which Pioneer billed Allstate was unlawful due to a forged signature of Krpichak.

125.   As detailed below, Northland's predetermined treatment protocol called for extremely aggressive recommendations for invasive procedures and surgeries and it regularly exaggerated and fabricated its evaluation records to create the appearance of necessity for such treatments.

126.   It was not uncommon for Northland to claim that it made dozens of separate individual "diagnoses" of patients – and on occasion more than 50 – the vast majority of which were merely restatements of subjective complaints and impertinent observations.

127.   These lengthy and immaterial records and lists were intentionally generated to create the appearance that patients were severely injured and required extensive treatment when they were not and did not.

128.   That Northland intentionally exaggerated and mischaracterized patient complaints is also confirmed with reference to contemporaneous records from other providers.

129.   For example, M.H. (Claim No. 0657920211) presented to Northland for an initial evaluation on November 2, 2022 at which time Northland claimed that M.H. was in excruciating and unbearable pain rated from 8/10 to 10/10 on the pain scale.

130.   M.H. had already been in a course of physical therapy that included modalities and exercises that could not have been performed at those pain levels, and in fact the very next day, November 3, 2022, M.H. reported to his physical therapist that his pain levels were 6/10, which are nowhere near the 10/10 maximum pain levels claimed by Northland.

131.   Northland also falsified alleged bases to perform procedures in order to create the appearance of necessity.

132.   For example, on September 1, 2020, C.G. (Claim No. 0641730007) presented to Northland and was noted to be bandaged and dripping blood from his arm.

133.   Northland immediately called an ambulance to transport C.G. to the hospital, but claimed that prior to C.G. leaving, it administered a Toradol injection.

134.   The record for the Toradol injection claimed that it was done to address neck and back spasms, which had nothing to do with C.G.'s actual presentation with a lacerated and bleeding arm.

135.   The record of the injection also claimed, to create the appearance that Northland performed services to justify the excessive amount it billed, that the patient was observed for 15-20 minutes following the injection.

136.   Such observation was not done as C.G. was emergently placed in an ambulance and transported to a hospital to have his bleeding arm addressed.

137.   Northland also fabricated patient responses to treatments in an attempt to create the appearance that they would be reasonable and appropriate to repeat and that similar procedures would be proper.

138.   For example, on October 29, 2021, Northland billed for a caudal ESI to B.K. (Claim No. 0643973951).

139.   On November 9, 2021, Northland recorded that the patient reported the injection had helped "very little."

140.   After numerous intervening evaluations, on June 8, 2022, Northland claimed that the October 29, 2021 ESI afforded a "great deal of temporary relief from his low back and leg pain."

141.   This statement is clearly false, but it was also difficult to detect that it was a misrepresentation (which Northland knew) because it was made so long after the contemporaneous report with extensive intervening treatment and records.

142.   Similarly, Northland billed for a lumbar ESI to R.B. (Claim No. 0607464203) on December 14, 2020.

143.   On December 28, 2020, Northland reported that the ESI had provided R.B. with no relief at all and reported on the same date that Lidocaine patches that were prescribed to R.B. gave him a rash so were not used.

144.   Northland continued prescribing R.B. with Lidocaine patches at nearly every appointment and they were billed by an associated pharmacy for exorbitant prices.

145.   On March 25, 2021, Northland falsely claimed that the ESI that had plainly failed "afforded R.B. a great deal of relief" and recommended that he undergo additional injections, which flatly contradicts the actual report at the time of the injection.

146.   Northland also misrepresented other treatment that patients had allegedly undergone in order to create the appearance that its aggressive orders for MRIs and injections were proper.

147.   As discussed further below, both MRIs and injections require that patients first attempt conservative care to be considered medically appropriate and necessary.

148.   Thus, to create the appearance that these services for which Northland billed Allstate many millions of dollars were proper, Northland needed to report that patients had attempted and failed conservative therapy.

149.   One way that Northland did this was to include a direction to "continue physical therapy" in its listed treatment plan.

150.   This direction was included in treatment plans as a matter of course even though Northland did not evaluate whether physical therapy was effective and was also included even when patients were not actually undergoing physical therapy at all.

## VII.   **MULTIPLE BILLING FOR IDENTICAL SERVICES**

151.   For the vast majority of the procedures at issue, the defendants billed both Current Procedural Terminology ("CPT")[2] and HCPCS codes that are inclusive of all purported services performed during the procedures and separate and

---

[2] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

additional line items for services, supplies, testing, and other materials allegedly used during such procedures, which constitutes fraudulent double billing.

### A.  FRAUDULENT DOUBLE BILLING FOR PROCEDURES

152.  One frequent method of fraudulent double billing used by the defendants was to bill for the alleged use of fluoroscopic guidance during injections when such guidance is expressly included in the charge for the injection itself.

153.  For example, Northland routinely included a separate charge for fluoroscopic guidance with its bills to Allstate for purported cervical and lumbar facet block injections.

154.  Northland submitted numerous bills for payment to Allstate for facet block injections using CPT codes 64490 through 64495, and also included a separate and additional charge for fluoroscopic guidance using CPT code 77002 or 77003, even though the descriptions for the facet block injection codes each expressly state that they include fluoroscopic guidance.

155.  Northland similarly double billed charges for guidance for ESIs it billed to Allstate.

156.  Unlike facet injections, ESIs can be billed with CPT codes that expressly include imaging guidance or with CPT codes that report to the payor that imaging guidance was not used.

157.   In order to conceal its double billing for guidance associated with ESIs, Northland billed using the CPT codes that claim that imaging guidance was not used and also separately and additionally for imaging guidance.

158.   If imaging guidance was actually used during the any of these alleged procedures, it was only appropriate to bill a single time using the appropriate CPT code and not to bill twice as Northland did to multiply the charge amount.

## B.   FRAUDULENT DOUBLE BILLING FOR ANESTHESIA

159.   Northland further fraudulently multiplied its charges for alleged injections by billing separately and additionally for the different types of anesthesia claimed to have been used during the procedures.

160.   As detailed above, much of the anesthetic material billed was not actually used and amounted to billing for services not rendered at all.

161.   Even the anesthetic that was used was fraudulently billed, as anesthetizing a patient for an invasive procedure is considered a necessary component of such invasive procedure and the charge for doing so is included in the bill for the procedure itself.

162.   Northland routinely billed Allstate thousands of dollars for local anesthetic allegedly used in conjunction with pain management procedures, none of which was separately billable at all.

163.   Northland similarly fraudulently billed for the substances allegedly administered in relation to medically unnecessary sedation and monitored anesthesia care used for routine pain management injections and other procedures.

164.   Billing for these types of anesthesia includes all associated services, including the pre- and post-procedure evaluations and the supplies used.

165.   Northland fraudulently double billed charges for the substances allegedly injected and infused during anesthesia care, and often the amount improperly billed for these substances far exceeded the amount billed for the anesthesia itself.

## C.   DOUBLE BILLING FOR DRUG TESTING

166.   In addition to billing for drug testing not performed and for excessive and medically unnecessary testing, Pioneer also fraudulently double billed its charges for such purported testing to demand further payments to which it was not entitled from Allstate.

167.   One method used by Pioneer to double bill its drug test charges was to bill separately for specimen validity testing, including testing urine specimens for their pH and creatinine levels.

168.   Specimen validity testing is considered a quality control measure for urine drug testing that is a component of the testing itself, and therefore it is not to be separately and additionally billed.

169.   Moreover, when Pioneer billed for drug testing using G0483, which was always for services not rendered as explained above, it violated the express published definition of the code by billing separately and additionally for specimen validity testing as HCPCS code G0483 is defined as:

> Drug test(s), definitive, utilizing (1) drug identification methods able to identify individual drugs and distinguish between structural isomers (but not necessarily stereoisomers), including, but not limited to gc/ms (any type, single or tandem) and lc/ms (any type, single or tandem and excluding immunoassays (e.g., ia, eia, elisa, emit, fpia) and enzymatic methods (e.g., alcohol dehydrogenase)), (2) stable isotope or other universally recognized internal standards in all samples (e.g., to control for matrix effects, interferences and variations in signal strength), and (3) method or drug-specific calibration and matrix-matched quality control material (e.g., to control for instrument variations and mass spectral drift); qualitative or quantitative, all sources, **includes specimen validity testing**, per day; 22 or more drug class(es), including metabolite(s) if performed.

(emphasis added).

## VIII.  UNREASONABLE,   UNNECESSARY,   AND   EXCESSIVE TREATMENT

170.   The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

171.   Together, the defendants utilized a predetermined protocol of treatment through which patients were prescribed the same tests, treatment, and unnecessary

and indiscriminate drug testing that were designed to maximize the amount of the bills submitted to Allstate.

172. This predetermined protocol did not take into consideration the individual patient's medical needs, injuries, or comorbidities, but instead was designed to generate charges regardless of clinical justification.

173. As part of the predetermined treatment protocol, the defendants subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services, risking patient safety in order to inflate their bills to Allstate.

174. The defendants' purported treatment violated standards of care in the medical community, as the testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

175. The full extent of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

176. The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 and 2.

177. All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, unlawful, and unreasonable treatment are fraudulent.

178. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid and expenses incurred as a result of the defendants' fraud.

179. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

A.   THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

180. The defendants' treatment protocol was characterized by an initial evaluation of patients at Northland, at which time Northland (1) made generalized, vague (and false, as discussed *supra*) diagnoses, (2) ordered an incredible amount of immediate diagnostic testing, typically consisting of multiple MRIs and/or CT scans, (3) billed for issuing DME, (4) pressured patients to undergo immediate injections, and (5) automatically ordered extensive panels of presumptive and definitive drug testing, billed by defendant Pioneer.

181. As part of the defendants' predetermined treatment protocol, patients also were scheduled to undergo frequent reevaluations at Northland, at least every

two (2) to four (4) weeks, whether or not there was any medical need for such reevaluations.

182.   The defendants used these frequent reevaluations to order additional injections, drug testing, and MRIs and to make pain management referrals to other Northland physicians, none of which was in response to patient specific complaints and none of which was necessary.

183.   One patient, B.W. (Claim No. 0709342653), explained to Allstate that when he presented at Northland he was given a back brace and heating pad even though Northland knew that he already had the items from a previous provider because "that's just their process to anyone that comes to them," which further illustrates how Northland's treatment was predetermined and not patient specific.

184.   Another patient, L.C. (Claim No. 0703140251), testified that although Northland billed for numerous MRIs (at least eight (8)), he does not recall anyone going over the results with him.

185.   L.C. also testified that he underwent electrodiagnostic testing billed by Northland and that no one went over the results of that test with him.

186.   Tests that were ordered and billed and for which there was no effort to review the results and guide further treatment are further evidence that Northland's predetermined treatment protocol was designed only to generate massive charges to Allstate and not to render actual patient care.

187.   The following are specific components of Northland's predetermined treatment protocol, including the reasons why the treatments were medically improper and unnecessary and specific representative patients exemplifying the same.

**B.   EXCESSIVE AND UNNECESSARY IMAGING**

188.   The primary method used by the defendants to generate enormous charges to Allstate was subjecting patients to excessive and unnecessary MRIs and CT scans, which Northland controlled by both prescribing and then billing for (allegedly) performing the MRIs.

189.   Northland ordered imaging studies at initial evaluations of patients regardless of their complaints, their objective presentations, and even whether they had already undergone recent similar or identical diagnostic studies.

190.   For example, M.E. (Claim No. 0612994285) presented to Northland for an initial evaluation on May 28, 2021, and per Northland's typical protocol, was immediately directed to undergo seven (7) separate MRIs (of his brain, entire spine, and bilateral knees).

191.   Just months before M.E. presented to Northland, he had undergone a spinal surgery in March 2021 that resulted in complications and a hospitalization.

192.   As a result of this very recent prior treatment, M.E. had a full and extensive diagnostic workup, and the MRIs ordered by Northland served no additional medical purpose at all.

193.   Similarly, C.G. (Claim No. 0641730007), the patient addressed above who presented to Northland with a heavily bleeding arm and was transported by ambulance, was admitted to the hospital and underwent surgery on his arm.

194.   When C.G. returned to Northland just five (5) days after his discharge from the hospital on September 8, 2020, Northland billed for four (4) separate MRIs.

195.   Obviously, if C.G. had actually required such imaging it would have been performed while he was a hospital inpatient undergoing surgical procedures.

196.   R.B. (Claim No. 0607464203) presented to Northland on July 6, 2020, at which time he was a resident of an inpatient rehabilitation facility after having recently been discharged from a lengthy hospital stay.

197.   As with the patients above, there was no reason for Northland to suspect that R.B. had not obtained all appropriate diagnostic studies during the intensive course of treatment that he was already undergoing.

198.   Indeed, Northland by its own account admitted that it did not have an understanding of the treatment R.B. had already undergone as it noted that it was working with his case manager to get an understanding of the surgeries that had already been performed.

199.   Nevertheless, Northland ordered and billed for at least seventeen (17) different MRIs and CT scans of R.B. starting on the date of the initial examination (July 6, 2020) and continuing on July 12, 2020 and July 13, 2020.

200.   The case manager's contemporaneous notes from the same date record that Northland recommended R.B. undergo x-rays of various body parts and say nothing of the numerous MRIs and CT scans that were billed by Northland.

201.   Not only were these orders excessive, premature, and completely unnecessary, R.B. was in so much pain and discomfort when he presented to Northland that he was unable to get out of his wheelchair for a physical examination.

202.   Subjecting a patient in excruciating pain to seventeen (17) separate imaging scans, which would have taken hours out of his wheelchair in various positions, that were completely unnecessary was not just fraudulent and medically improper, it was inhumane, if they were actually done at all.

203.   Northland also ordered repetitive and duplicative imaging for no reason other than the passage of time, which has no clinical basis.

204.   For example, on July 7, 2021, Northland billed for repeat MRIs of R.B.'s spine and bilateral hips and knees for no reason other than that it had been a year since the prior MRIs were performed.

205.   There was no particular clinical concern about R.B.'s lower extremities or neurologic condition at the time of these scans and they were not used to guide

any further treatment of R.B.; they were simply performed (if at all) to generate more than $24,000 in additional bills to Allstate.

206. Similarly, Northland billed for five (5) MRIs of L.N. (Claim No. 0642286223) on February 24, 2021 and then for nine (9) MRIs of L.N. just six (6) months later on September 1, 2021, at which time all five (5) of the body parts subjected to the earlier MRIs were repeated for no medical reason.

207. Further, Northland billed for allegedly performing MRIs of L.N.'s right shoulder at least three (3) separate times over the course of less than one year from September 1, 2021 to August 31, 2022.

208. Northland's explanation for billing for the third MRI of L.N.'s right shoulder was that a separate surgeon had recommended she undergo arthroscopic surgery on the joint.

209. There is no medical or practical purpose for performing a redundant imaging study on L.N.'s shoulder, particularly as it had already been determined that she had an internal derangement that required surgery.

210. Further, the results of this MRI were apparently never given to the surgeon (to whom patients of Northland were frequently referred), because he then ordered yet another MRI of L.N.'s right shoulder.

211.   Northland billed for so many MRIs and with such frequency that the results could not have been and were not used to actually guide patient care and, in some cases, its physicians were not even aware of purported MRI results.

212.   For example, on November 9, 2021, Northland billed for alleged cervical and lumbar MRIs of B.K. (Claim No. 0643973951) despite the fact that B.K. had undergone identical MRIs at a separate facility in December 2020.

213.   Just over two (2) months later, on January 18, 2022, B.K. returned to Northland where its physician suggested (for no medical reason) repeating the MRIs that were taken in December 2020, apparently not even aware that they had already been improperly repeated and billed by Northland in November 2021.

214.   Allstate is entitled to the return of money paid for and expenses incurred as a result of Northland's medically unnecessary imaging ordered and billed pursuant to the defendants' predetermined treatment protocol and is entitled to a ruling that it has no obligation to pay the pending claims seeking payment for the same.

### 1.   Medically Unnecessary and Improper MRIs

215.   Northland ordered MRIs as a matter of course because Northland served as a stop on a mobile MRI route and billed millions of dollars in charges to Allstate for such imaging.

216.   Northland's MRIs that were ordered and billed as a matter of course were improper and non-compensable for numerous reasons, including those set forth below.

### a.   MRI Testing Ordered and Billed Contrary to Standard of Care

217.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

218.   Northland cannot reasonably dispute the authoritativeness of the ACR and its guidelines, as it sought and obtained accreditation from the ACR for its facility.

219.   The ACR clearly guides that MRIs should not be ordered based on minor and non-specific pain complaints, such as those that predominantly comprise the list of "diagnoses" made by Northland.

220.   Rather, an MRI should only be ordered after a thorough evaluation and examination documented in the patient's medical record.

221.   For musculoskeletal joint MRIs, this means an orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers.

222. For spinal MRIs, this means a neurological examination including muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

223. The vast majority of patients with complaints of back pain do not require even x-rays, and imaging such as MRI is reserved for patients with progressive and severe neurologic deficits, and only after conservative treatments fail.

224. For brain MRIs, imaging is only appropriate for patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

225. For patients with headaches after whiplash type injuries, or with mild head injuries, MRIs are not necessary and have been shown to not have any influence on the treatment or outcome of patients' complaints.

226. The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

227. For example, for cervical spine imaging, the ACR guides that MRIs are "usually not appropriate" as the initial study, including when the patient has a history of trauma or prior surgery.

228.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

229.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

230.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "<u>may</u> be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

231.   Clinical practice guidelines advise at least six (6) weeks of conservative care before proceeding to MRI.

232.   MRIs should not be ordered in violation of the foregoing guidelines unless there is a clinical reason in the specific case and that reason must be documented in the patient's medical record.

233.   The defendants routinely ordered and billed for MRIs in violation of the foregoing guidelines and in violation of their responsibility to ensure that MRIs were properly ordered and medically necessary.

234.   One example of the defendants' failure to adhere to ACR guidelines, B.W., the patient discussed above who reported being scanned just once despite

Northland billing for fourteen (14) separate MRIs, reported that at the time of the imaging he had complained of pain in his back, right shoulder, and left ankle and leg "from time to time."

235.   None of these complaints of "pain" were anywhere close to justifying advanced imaging, particularly the leg pain that was expressly described as sporadic.

236.   Northland nevertheless billed for MRIs of B.W.'s entire spine, pelvis, _bilateral_ shoulders, and a total of eight (8) scans of his _bilateral_ lower extremities.

237.   At least five (5) of these scans did not even have (insufficient) subjective complaints to provide any explanation at all for why imaging was needed, and each of these was billed at a rate of more than $4,000 per body part.

238.   When Northland improperly and unnecessarily repeated cervical and lumbar MRIs that were already done to B.K. (Claim No. 0643973951) on November 9, 2021 as discussed above, it also added a charge for a thoracic MRI despite the fact that B.K. had not complained of and Northland had not recorded any purported thoracic spine pain, much less made a suspected diagnosis that would warrant advanced imaging.

239.   Northland, Gandhi, and Krpichak routinely ordered and billed for performing MRIs based only on patients' subjective pain complaints (or with no complaints at all), without documenting any valid and sufficient clinical reason for the MRIs and before even attempting conservative treatment.

**b.     MRIs Billed During Initial Stages of Treatment**

240.   Northland regularly ordered and billed for extensive MRIs the very first time it encountered patients, which was often within days and weeks of alleged motor vehicle accidents.

241.   It is not possible that patients who were directed to undergo MRIs so quickly could have sufficiently attempted (or in many cases, even begin) conservative treatment.

242.   Such a practice is contrary to authoritative  medical literature (in addition to the ACR guidelines), which provides that "unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."  Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

243.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

244.   As one example of Northland ordering and billing for excessive numbers of MRIs shortly after claimed accidents and before any significant conservative treatment was attempted, it billed for nine (9) separate MRIs of W.P.

(Claim No. 0615107612) on October 7, 2020, which was just two (2) weeks after an alleged accident on September 23, 2020.

245.   There was not sufficient time for W.P. to have attempted any type of conservative care prior to this imaging, much less care to all nine (9) separate body parts that were allegedly imaged.

246.   That the MRIs were premature and unnecessary is further confirmed by the fact that W.P. did not return to Northland for more than a year after their performance, so these MRIs, which were billed to Allstate for a total amount exceeding $37,000, were not used at all to guide treatment.

### c.   Excessive Numbers of MRI Scans

247.   Perhaps the most egregious component of the unnecessary and improper MRIs ordered and billed by Northland was their sheer number.

248.   As explained above, MRIs should be limited to body parts for which there are significant and concerning examination findings and should not be performed without specific and adequate basis.

249.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,117) of all patients underwent MRIs of multiple body parts during the same visit, and only 3.4% (31,044

of 905,117) of all patients underwent MRIs of three (3) or more body parts during the same visit.

250.   Likewise, in 2020, the data reported to the State of Michigan by all MRI providers documents that just 12.27% (95,225 of 776,276) of all patients underwent MRIs of multiple body parts on the same visit, and only 2.9% (22,475 of 776,276) of all patients underwent MRIs of three (3) or more body parts during the same visit.

251.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

252.   By comparison, between January 6, 2021 and May 3, 2024, Northland (an outpatient clinic) billed Allstate for MRI visits on 160 separate dates of service for its patients, and it billed for two (2) or more MRIs during those visits 119 times, or on more than 74% of all MRI visits.

253.   Out of 97 different patients for whom Northland billed Allstate for performing MRIs between January 6, 2021 and May 3, 2024, 84 of those patients, or more that 86%, received two (2) or more MRIs on a single date of service for which MRIs were billed by Northland.

254.   Northland billed Allstate for four (4) or more MRIs on a single patient on a single date of service with respect to 63 of the 97 patients for whom it billed

Allstate between January 6, 2021 and May 3, 2024, representing more than 64% of all such patients.

255.   Fourteen (14) patients for whom Northland billed Allstate during the same period allegedly received an incredible ten (10) or more MRIs on a single date of service.

256.   One patient – L.N. (Claim No. 383343863) – was billed for twenty-eight (28) separate MRIs at a cost of over $120,000.

257.   One of the ways that Northland was able to bill for so many MRIs (for more than $4,000 for each purported scan) was to bill separately for scans that could and should have been performed together.

258.   As discussed above, patients for whom numerous MRIs were billed, sometimes more than a dozen, have repeatedly reported to Allstate that they only underwent one scan.

259.   If any imaging of these body parts was actually done, it necessarily would have been by Northland significantly increasing the field for the scan and taking images of numerous body parts at once.

260.   As explained above, this does not permit Northland to bill separately as though it had performed scans of each body part individually, yet this is exactly how Northland fraudulently billed.

261.   Northland also produced separate radiologic reports for each body part to create the appearance that it performed separate MRIs of each body part for which it billed and to induce Allstate into paying for the same.

262.   Increasing the field and taking fewer images necessarily resulted in poorer quality images, which further reflects that the point of the MRIs was to generate charges and not to obtain diagnostically useful information.

263.   Indeed, it was common for the radiologists who reviewed the MRIs purportedly taken by Northland to comment that the images were of such low quality that it impaired their ability to interpret the same.

264.   Despite these repeated comments, Northland persisted in ordering extreme numbers of MRIs to be done at the same time that clearly could not have actually been intended to be used for clinical purposes and may not have been interpretable at all.

**2.     Excessive and Medically Unnecessary CT Scans**

265.   Northland also ordered and billed for excessive and medically unnecessary CT scans, both for patients who could not undergo MRIs and in addition to the already excessive MRIs for which it billed.

266.   As with MRIs, the ACR defines the practice parameters and technical standards for conducting CT scans.

267. According to the ACR, an order for a CT scan should "provide sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation."

268. The ACR also promulgates specific "Appropriateness Criteria" for CT scans, as it does for MRIs as discussed above.

269. For example, ACR Appropriateness Criteria for cervical spine imaging guides that CT scans are "usually not appropriate" immediately following acute trauma, such as an auto accident, if one of the following "low-risk factors" is present: (1) the pain was the result of a simple rear-end motor vehicle crash, (2) the patient is able to sit "in sitting position," (3) the patient is ambulatory, (4) there was delayed onset of neck pain, or (5) there is an absence of midline cervical spine tenderness.

270. As with the improper bills for MRIs at issue herein, the defendants' practice of ordering CT scans as a matter of course on patients with low risk factors based solely on alleged subjective pain complaints, whether in lieu of or in addition to ordering MRIs, violated standards of care for ordering and performing CT scans and the bills submitted to Allstate as a result of such practice are fraudulent.

271. Vague, minor, and non-specific pain complaints such as those routinely reported by Northland and Krpichak are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to CT scans.

272.   Nevertheless, Northland and Krpichak routinely ordered CT scans based only on patients' subject pain complaints, even when conservative treatment was effective and without documenting medical necessity for the CT scans ordered, which is in violation of the ACR Practice Parameters.

## C.   EXCESSIVE AND UNNECESSARY DRUG TESTING

273.   Defendants Northland and Krpichak also ordered drug testing as a matter of predetermined course and without regard to medical necessity and sent nearly all of the specimens they collected from patients to defendant Pioneer in order to generate additional charges to Allstate.

274.   Pioneer billed for outrageously excessive testing on the specimens collected and sent by Northland, including both presumptive drug testing and dozens of definitive drug tests on the same dates almost every time it billed Allstate.

275.   In the context of pain management practice, presumptive drug testing should be random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

276.   Guidelines published by the federal government for the proper use of drug testing performed in the context of a physician prescribing opioid medications to treat patients for chronic pain advise that testing may be appropriate to monitor for issues such as substance abuse disorder, medication adherence, diversion, efficacy, and side effects, and provide that in order to establish the medical necessity

for such testing, specific elements must be established during a clinical assessment and documented in the patient's medical record, including (1) patient history, physical examination, and previous laboratory findings, (2) the patient's current treatment plan, (3) a review of the prescribed medications, and (4) a risk assessment plan.

277.   According to federal guidelines, a risk assessment plan must evaluate the patient's risk potential for abuse and diversion, document that assessment, and categorize the patient as low risk, moderate risk, or high risk.

278.   The frequency of random testing for a given patient should depend on the provider's completed risk assessment of the patient.

279.   Federal guidelines provide that random testing of low risk patients one (1) to two (2) times every twelve (12) months is appropriate; random testing of moderate risk patients one (1) to two (2) times every six (6) months is appropriate; and random testing of high risk patients one (1) to three (3) times every three (3) months is appropriate.

280.   The defendants violated these guidelines in numerous ways, including ordering serial drug tests for patients who were not prescribed opioids (or other drug subject to abuse or misuse) at all, not performing risk assessments, and ordering and billing for drug testing at rates that far exceeded what could be considered reasonable and appropriate.

281.   In addition to ordering and billing for drug testing far more frequently than was medically appropriate, the defendants generated additional charges by ordering and billing for both presumptive and definitive drug testing of nearly every patient, even when there was no need for the definitive drug testing and even when that testing was not actually ordered.

282.   Presumptive drug testing is appropriately used, when done as part of a patient specific treatment plan and not as a predetermined matter of course, for a medical provider to quickly rule out illicit drug use or to confirm the presence of a particular drug class in a patient's system.

283.   When presumptive drug testing confirms an expected result, there generally is no need for further testing.

284.   Only when presumptive testing (i.e., screening) shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory/definitive testing be performed, and only after the provider first discusses the unexpected test results with the patient, as the patient may at that point admit to improper use of drugs/medications without the necessity of further testing.

285.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation

[definitive testing] is not always necessary.  Clinical correlation is appropriate . . . .

In addition, a confirmatory [definitive] test may not be needed; patients may admit

to drug use or not taking scheduled medications when told of the drug test results,

negating the necessity of a confirmatory [definitive] test.  However, if the patient

disputes the unexpected findings, a confirmatory [definitive] test should be done."

286.   Contrary to these guidelines, Pioneer billed for both presumptive

testing and for performing dozens of definitive drug tests even when there were no

unexpected results at all.

287.   The utter pointlessness of Pioneer's bills for presumptive tests is

evidenced by the fact that the purported prescriber of the tests (defendant Northland)

was not even advised of their results before specimens were then also definitively

tested.

288.   In other words, it was predetermined that definitive testing would be

performed regardless of whether there were unexpected results with the presumptive

tests, so the additional $1,000 for presumptive testing served absolutely no purpose.

289.   In fact, in many cases, the alleged presumptive testing billed by Pioneer

was done after definitive testing was already performed.

290.   For example, Pioneer billed for both presumptive and definitive drug

testing on a specimen collected by Northland from R.B. (Claim No. 0607464203)

on September 17, 2020.

291.   The laboratory reports submitted by Pioneer document that the definitive test was done at 11:45 a.m. on September 21, 2020.

292.   The specimen was then allegedly sent to a separate contracted laboratory called Auspicious Labs where it was received at 12:28 p.m. on September 21, 2020 and tested at 1:36 p.m. that same day, both of which were after the definitive testing had already been done.

293.   Similarly, Pioneer billed for both definitive and presumptive testing of a specimen collected by Northland from C.G. (Claim No. 0641730007) on September 8, 2020.

294.   The definitive test was allegedly performed at 11:55 a.m. on September 11, 2020 and the separate laboratory that allegedly performed the presumptive testing did not even receive the specimen until 12:40 p.m. that same date.

295.   There is no purpose other than generating an additional bill to explain why a specimen would be tested presumptively after a definitive test had already been performed.

296.   On January 12, 2021, Pioneer again billed for both presumptive and definitive testing of a specimen allegedly collected by Northland from R.B. (Claim No. 0607464203).

297.   This specimen was apparently divided and sent separately to Pioneer and the lab with which it contracted for presumptive testing, and the specimen was

received at the confirmative/definitive testing laboratory before it was received at the presumptive testing laboratory, which again confirms that the presumptive testing served absolutely no purpose.

298.   The records the defendants generated to purportedly document orders for these clearly unnecessary drug tests also fail to establish that any definitive tests were actually intended to be ordered by physicians.

299.   The typical form used by Northland and Pioneer to create the appearance that drug testing was ordered by physicians for medically proper purposes actually directed Pioneer only to "confirm all positive presumptive test results" and "cross reference and Definitive Test Medication list for Unexpected Negatives":



300.   As detailed above, Pioneer could not have used definitive testing to confirm positive presumptive test results or unexpected negative results as definitive testing was often performed before presumptive testing.

301.   Further, Northland did not provide Pioneer with an accurate list of medications or any list of medications prescribed to the patient at all to guide the limited definitive testing called for by these orders.

302. Pioneer nevertheless billed for allegedly performing a full panel of presumptive testing as well extensive definitive drug testing even when all of the presumptive drug testing was negative and there were no unexpected results and reported such results to Northland, which never corrected these improper and excessive tests and in fact continued ordering hundreds of tests in exactly the same manner.

303. The drugs and analytes alleged tested by Pioneer pursuant to its predetermined protocol were also pointless and had no relation to the medications prescribed to patients or potential for abuse or misuse thereof.

304. For example, on June 30, 2022, Pioneer billed for extensive testing of a specimen allegedly collected by Northland from B.K. (Claim No. 0643973951).

305. On that date, B.K. was two (2) days out from a neck surgery performed by a different physician unaffiliated with Northland who was prescribing post-surgical pain relief medication such that there was no reason at all for Northland to be monitoring B.K.'s drug use at the time.

306. Northland then prescribed B.K. a drug called Remeron, which is a tetracyclic antidepressant.

307. The next time that Pioneer billed for an alleged drug test, on July 28, 2022, it billed for testing for the presence of tricyclic antidepressants and selective

serotonin reuptake inhibitors (another type of antidepressant), but not the tetracyclic antidepressants that were the class of medication B.K. was actually prescribed.

308.   On the same date, a separate Northland physician who was a neurologist prescribed a tricyclic antidepressant called nortriptyline.

309.   Pioneer then billed for yet another comprehensive drug test on August 11, 2022 (despite the fact that the previous tests had not raised any concerns) and the specimen tested negative for nortriptyline, which was not addressed by Northland.

310.   Among the drugs and analytes that were included in Pioneer's predetermined protocol of definitive testing was cotinine, which is the metabolite of nicotine and which does not have any interactions with other drugs that could have been of concern for any patient at issue herein.

311.   In many cases, including a representative example of W.P. (Claim No. 0615107612) on October 7, 2020, Northland ordered and Pioneer billed for drug testing on patients who were not prescribed any drugs at all, which serves no purpose other than generating charges.

312.   That the drug testing ordered by Northland and Krpichak and billed by Pioneer was unnecessary is also illustrated by the fact that Northland and Krpichak did not actually use the results of such testing to guide its prescriptions and treatment plans.

313. For example, Pioneer billed for alleged drug testing on a specimen collected from L.N. (Claim No. 0642286223) by Northland on July 20, 2021.

314. Despite being prescribed the opioid Norco by Northland, the specimen tested negative for all drugs and analytes, including the active ingredients of Norco.

315. When L.N. returned to Northland on July 27, 2021 for an appointment that Northland expressly referred to as a "medication check," the July 20, 2021 failed drug test results were not used at all to guide further treat because the results had inexplicably not been reported back to Northland by Pioneer.

316. Rather than attempt to track down the results of the testing that had been performed a week prior and billed to Allstate for thousands of dollars, Northland instead collected a new specimen and ordered thousands of dollars of additional testing that was billed by Pioneer and no change was made to L.N.'s treatment plan.

317. The July 27, 2021 specimen also tested negative for all substances (i.e., was a failed test showing the patient was not taking her prescribed opiate), and subsequent tests ordered by Northland and billed by Pioneer were also failed on August 4, 2021 and August 19, 2021.

318. None of these failed drug tests were acted upon in any way by Northland, and L.N.'s treatment plan only changed after she complained about being subjected to weekly drug tests.

319.   Further, the specimen that was collected on August 19, 2021 was not received by Pioneer until August 24, 2021 and was not tested until August 26, 2021, but L.N.'s Norco prescription was refilled on August 20, 2021, which confirms that the drug test had no bearing on her medication management.

320.   Similarly, specimens collected from M.E. (Claim No. 0612994285) repeatedly tested negative for the presence of buprenorphine, which is an opiate that is the ingredient in medication called Belbuca that was prescribed by Northland to M.E.

321.   The repeated failed drug tests were never addressed and M.E. continued to be prescribed Belbuca despite the results.

322.   Northland's and Krpichak's orders and Pioneer's billing for serial drug tests for which the results were ignored and did not influence changes in medication or treatment plan evidence that the tests were not ordered for any legitimate medical purpose and were never compensable.

323.   Allstate is not required to pay for medically unnecessary drug testing that was ordered for the sole purpose of increasing the amount of bills to Allstate and not used in any way to influence treatment plans and is entitled to a return of the money it paid as a result of the defendants' fraudulent submissions.

**D.** **EXCESSIVE AND UNNECESSARY INJECTIONS AND PROCEDURES**

324.   The performance of invasive procedures, including injections, must be based upon adequate diagnosis and legitimate medical necessity.

325.   As discussed above, examinations billed by the defendants, if they were performed at all, resulted only in vague and boilerplate findings that were often fabricated and exaggerated, and predetermined treatment plans.

326.   As part of the predetermined treatment protocol to generate as many bills as possible, Northland routinely made aggressive recommendations and internal referrals of patients to its "pain management" physicians for extensive series of injections that were not medically indicated or appropriate.

**1.** **Medically Unnecessary and Improper Injections**

327.   Northland routinely and repeatedly billed for intramuscular Toradol and vitamin B12 injections, often beginning at patients' initial visits and continuing at numerous follow up visits.

328.   Toradol is a non-steroidal anti-inflammatory ("NSAID") and in its injectable form, is properly used only as a short-term (for a matter of hours) treatment of moderately severe acute pain.

329.   Toradol injections should not be used for longer than five (5) days, for mild pain, or for pain from chronic conditions, as their use may have serious side effects, the risk of which increases with the length of use.

330.   Contrary to these guidelines, Northland frequently billed for administering repeated Toradol injections to patients, often on a weekly basis for up to several months at a time.

331.   Like all NSAIDs, Toradol increases the probability of developing side effects such as stomach ulcers.

332.   Northland nevertheless administered Toradol injections to patients who expressly had a history of such conditions, including W.P. (Claim No. 0615107612).

333.   NSAIDs like Toradol are also contraindicated for patients with some comorbidities, such as renal failure.

334.   M.E. (Claim No. 0612994285) presented to Northland on May 28, 2021 and it was expressly noted that he had a history of renal failure and that NSAIDs would be avoided as a result.

335.   Northland nevertheless repeatedly billed for allegedly administering Toradol injections to M.E., which, if actually performed, subjected M.E. to an unacceptable risk of complications that Northland was indisputably aware of.

336.   Toradol can also cause uncontrolled bleeding events for patients who are on blood thinners but Northland nevertheless billed for administering them to patients on such medications, including R.B. (Claim No. 0607464203), without any assessment of the risks.

337.   Medial branch block ("MBB") injections, also referred to as facet block injections, are indicated when a patient complains primarily of axial, non-radiating spinal pain and involve injecting anesthetic near medial branch nerves that feed out from facet joints.

338.   Medial branch block injections are intended to be diagnostic, in that if a patient experiences a sufficient level of short-term pain relief for an appropriate period of time then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for other therapeutic treatments such as radiofrequency ablation or rhizotomy.

339.   There is rarely a medical reason to repeat MBBs, as the diagnostic information of whether a patient experienced pain relief through such treatment is typically gleaned from the first procedure.

340.   Northland nevertheless routinely billed for repeated facet injections, which it often called "confirmatory," which evidences its awareness that the diagnostic information had already been obtained.

341.   As one example illustrating how MBBs were repeated as a matter of course and without regard to patients' responses, on July 7, 2021, Northland billed for alleged MBBs to B.K. (Claim No. 0643973951).

342.   On July 28, 2021, Northland billed for an evaluation and reported that B.K. "cannot articulate how much relief he experienced."

343.   Northland nevertheless billed for repeating the MBBs on August 4, 2021 without any understanding of the length or degree of benefit B.K. obtained from the first injections.

344.   Northland also billed for facet injections that could not have been used for their intended diagnostic purpose, including because in its effort to bill as much as possible, Northland billed for other procedures to the same area of patients' bodies that necessarily confounded any information gleaned from the injections.

345.   Northland also billed for injections for patients for whom they were medically inappropriate.

346.   For example, Northland billed for alleged MBBs to R.B. (Claim No. 0607464203) on June 7, 2021.

347.   On the same date, Northland billed for electrodiagnostic testing of R.B.'s lower extremities, evidencing that it had a concern that (based on R.B.'s pain complaints) his pain was radicular and not axial, the latter of which is the target of MBBs.

348.   Then, on July 7, 2021, Northland billed for an alleged lumbar ESI to R.B., which targets radicular symptoms, but also planned on that date to schedule R.B. for RFAs, which target axial pain and which are contraindicated for patients with radicular symptoms.

349. Northland then proceeded to bill for the RFA despite also reporting that R.B.'s pain was virtually gone after the ESIs, which is further evidence (that Northland knew all throughout the treatment it billed) that R.B.'s pain was emanating from his disc and not the facet joints that Northland billed tens of thousands of dollars for injecting and cauterizing.

350. Northland also improperly billed for RFAs, which are the more permanent way to address axial pain after its facetogenic origin is determined through MBBs.

351. It is only proper to bill for RFAs at most once every six (6) months because the procedure cauterizes the nerves that are determined to be the source of pain and they take at least that amount of time to grow back and begin generating pain again.

352. As one example of Northland's improper use of RFAs to generate enormous bills rather than render medically appropriate care, it billed for performing right-sided sacroiliac joint RFAs to L.N. (Claim No. 0642286223) on June 21, 2022 and then again just three (3) weeks later on July 12, 2022 (and, as discussed above, submitted a procedure report claiming to have performed yet another right-sided RFA on June 7, 2022).

353. There is absolutely no medical basis to perform RFAs twice (or three (3) times) in a matter of weeks and L.N. was subjected to potential risks and

complications of these procedures solely to multiply the amount of Northland's charges to Allstate.

354.   All bills for injections that were unnecessary and served no medical purpose were fraudulent and Allstate is entitled to repayment of all amounts it was induced to pay as a result of the defendants' bills and records that represented otherwise.

### 2. Medically Unnecessary Use of Anesthesia with Injections

355.   Northland multiplied the amounts charged to Allstate and increased the danger of complications to its patients by performing routine pain management injections under anesthesia.

356.   The ESIs, MBBs, and other injections commonly billed by the defendants are simple injections that are performed in just minutes and can and should be performed with only a local anesthetic absent unique circumstances that are documented in a patient's medical record.

357.   Guidelines published by the federal government instruct that general anesthesia is considered not medically reasonable and not necessary for facet joint interventions, and "neither conscious sedation nor Monitored Anesthesia Care ("MAC") is routinely necessary for intraarticular facet joint injections or medial branch blocks and are not routinely considered medically reasonable and necessary."

358.   Likewise, federal guidelines with respect to the use of ESI for pain management state that the use of moderate or deep sedation, general anesthesia, or MAC is "usually unnecessary [and] rarely indicated for these procedures and therefore, is not considered medically reasonable and necessary."

359.   Similarly, according to the American Society of Anesthesiologists ("ASA"),[3] "the majority of minor pain procedures do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections."

360.   The ASA further states that "[t]he use of general anesthesia for routine pain procedures is warranted only in unusual circumstances," which rarely present themselves.

361.   Contrary to these guidelines, defendant Northland routinely billed for anesthesia for patients receiving routine injections, but never documented any reasons why the use of anesthesia was necessary.

362.   Subjecting patients to anesthesia for routine injections, without any medical basis, resulted in patients taking unnecessary risks of infection, airway

---

[3] The ASA is an educational, research, and scientific association of physicians organized to raise the standards of the medical practice of anesthesiology and to improve patient care.

obstruction, and other risks associated with anesthesia, all in order to permit Northland to increase its bills to Allstate.

363.   The ASA has expressly warned that unnecessary use of anesthesia for routine injections is a risky practice that is a major factor in the occurrence of inadvertent neural injury.   Rendering patients unconscious during an ESI is especially risky because the patient cannot communicate nerve pain to the injecting physician if the needle is placed in a location that might cause neural injury.

364.   That Northland's billing for anesthesia in connection with routine injections was medically unnecessary is further evidenced by the inconsistency with which it billed.

365.   For example, Northland billed for an alleged lumbar ESI to R.B. (Claim No. 0607464203) on July 7, 2021 using just local anesthesia.

366.   When Northland improperly repeated the procedure on July 29, 2021, it inexplicably added charges for monitored anesthesia care even though there had been no complications or issues with use of only local anesthesia just a few weeks prior.

367.   For other spinal injections, including to B.K. (Claim No. 0643973951) on August 4, 2021, Northland used no anesthesia at all, further confirming that its use of sedation and monitored anesthesia care for these routine procedures was not necessary.

368. As addressed above, defendants Northland, Gandhi, and Krpichak always fraudulently double billed their charges for substances allegedly administered during anesthesia and charged thousands of times their cost, making their motivation for subjecting patients to these unnecessary services clear.

369. All of the charges submitted to Allstate by Northland, Gandhi, and Krpichak for injections and for the use of anesthesia in conjunction with injections that were not medically necessary are not compensable.

## IX. FRAUDULENT BILLING PRACTICES

370. The medical records, bills, and invoices submitted to Allstate by the defendants contained standardized billing codes.

371. Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

372. The defendants failed to meet this responsibility and instead submitted bills to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

373. All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and HCPCS codes.

374.   By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they chose.

375.   The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the AMA and the federal government, which publish CPT and HCPCS codes, respectively.

376.   Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

377.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

378.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

379.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

380. The defendants knowingly submitted false, incomplete, and misleading bills to Allstate, including submitting bills that included inaccurate and inappropriate CPT and HCPCS codes for the services they allegedly provided, with the intention that Allstate rely on those bills in order to make payments to the defendants to which the defendants knew they were not entitled.

381. Allstate relied on the bills submitted by the defendants to its detriment and was induced to make payments to the defendants to which they were not entitled and Allstate incurred expenses as a result of the defendants' fraudulent billing practices.

A.   FRAUDULENT UPCODING

382. As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and (3) were wholly unwarranted and unnecessary.

383. The billing codes submitted to Allstate by Northland also consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Allstate.

384. Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the

provider to select the appropriate CPT code for the complexity involved in the examination.

385.   There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

386.   Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; reexaminations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

387.   The final number to complete each five-digit CPT code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

388.   To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

389.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

390.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

391.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

392.   To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

393.   It is expected that the amount billed for an evaluation will vary depending on the complexity of the evaluation performed, with a higher amount charged for a higher complexity evaluation than for a low complexity evaluation.

394.   Since January 1, 2020, the vast majority of patient examination charges that Northland billed to Allstate were for level 4 and level 5 examinations.  *See* Exhibit 1.

395.   Northland's examinations consistently fell far short of meeting the threshold standard to bill for level 4 and level 5 encounters.

396.   Northland failed to obtain comprehensive patient histories or perform detailed physical examination and its use of boilerplate language in reports and a predetermined treatment protocol for virtually every patient does not reflect the decision making of moderate complexity required to bill for level 4 and 5 examinations.

397.   Many of the appointments for which Northland represented it performed high level and complex patient encounters were self-characterized as nothing more than "medication checks" at which no examination or patient history was performed at all.

398.   The defendants engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Allstate for patient appointments.

399.   By creating medical bills that included CPT codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

400.   However, the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT codes representing patient encounters that did not actually occur as billed.

**B.**  **FRAUDULENT USE OF CPT CODE MODIFIERS**

401.  CPT code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

402.  The defendants appended CPT code modifiers to their bills for improper reasons to increase charge amounts and to deceive Allstate into paying bills that violated coding rules and guidelines.

403.  The CPT code modifier that was most frequently abused by the defendants was modifier 59, which is used to report that charges that are ordinarily not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

404.  Appending modifier 59 to CPT codes improperly is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent double billing.

405.  Indeed, the federal government has released a publication warning providers that CPT code modifier 59 is overused and is associated with cases of fraud and abuse.

406.  The defendants routinely used modifier 59 in connection with their bills for double billed drug testing components, procedures, and evaluations that were not allowed to be billed separately for all of the reasons detailed above to falsely claim that an exception to coding rules that would prohibit separate billing of these charges

should not apply to their charges, which is precisely the improper use that the government has warned against.

## C.   IMPROPER BILLING DURING GLOBAL SURGERY PERIODS

407.   Billing regulations provide that the cost of many of the injections and procedures billed by Northland include all necessary services furnished before, during, and after a procedure, in what is referred to as the "global surgery package."

408.   Post-surgery services include subsequent evaluations and pain management related to the surgery.

409.   Periods during which post-surgery services are included in the cost of the procedure vary based on the procedure performed, but are generally either ten (10) days for relatively minor procedures or 90 days for surgeries.

410.   For procedures that include a 90-day global surgery package, the global period includes the day prior to the surgery, the day of the surgery, and 90 days following the surgery.

411.   Even when there is no post-surgery period applicable to a procedure, services performed on the date of a procedure are generally not payable as a separate service.

412.   Northland frequently improperly charged for examinations billed on the same day as purported injections, which is included in the global period for those procedures.  *See* Exhibit 1.

## X.  EXCESSIVE AND UNREASONABLE CHARGES

413.  Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

414.  The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

415.  In each such case, including those described in the following sections, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

416.  Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each claim, thereby incurring costs.

### A.  EXCESSIVE AND UNREASONABLE CHARGES FOR IMAGING

#### 1.  Unreasonable Charges for MRIs

417.  As previously discussed, Northland billed Allstate for performing numerous MRIs on almost every patient that were not medically necessary in order to generate additional claims for payment under the Michigan No-Fault Act.

418.   Northland also billed Allstate outrageous amounts for every MRI it allegedly performed, with every MRI at issue billed for at least $4,100 per scan and as much as $5,800 per scan.  *See* Exhibit 1.

419.   In total, Northland has billed Allstate more than $4,735,580 for purported MRIs just since 2020.

420.   Northland has made various representations to the Michigan Department of Community Health (which is now known as the Michigan Department of Health and Human Services) about its costs to obtain certificates of need ("CON") to obtain mobile MRI host sites.

421.   In an application to serve as an MRI host site that Northland submitted in December 2023, it reported that its total expenses in its first year would be $253,682 and would increase by less than 5% for each of the next two (2) years.

422.   Even if these costs were applied to each mobile route stop for which Northland holds a CON (which would overstate the actual costs because things like utilities would not need to be duplicated), Northland's total expenses for MRIs were only slightly over $1,000,000 per year.

423.   By contrast, Northland billed just Allstate (exclusive of all other auto insurers and other classes of payor to which it submitted bills) an average of more than $1,113,733 per year for the past four (4) years just for MRIs.

424.   Northland billed just Allstate more than twice its total costs annually, which was just a fraction of the total amount billed to all insurers and payors.

425.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

426.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

427.   Northland's charges for MRIs are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### 2.   Unreasonable Charges for CT Scans

428.   As previously discussed, Northland routinely billed Allstate for multiple, medically unnecessary CT scans ordered by its physicians.

429.   Northland routinely charged Allstate between $2,800 and $3,200 for each of the CT scans it allegedly performed on Allstate insureds.  *See* Exhibit 1.

430.   By way of example, Northland routinely charged $3,100 for CT scans of the head and brain using CPT code 70450, $3,200 for CT scans of the thorax using CPT code 71250, and $2,800 for CT scans of the neck and cervical spine using CPT code 72125.

431.   In comparison, for 2020, the payment rate set by the federal government for CT scans in the Detroit metropolitan area was $146.03 for CT scans billed using

CPT code 70450, $157.23 for CT scans billed using CPT code 71250, and $153.01 for CT scans billed using CPT code 72125.

432.   The federal payment amounts are indicative of the range of what constitutes a reasonable charge for CT scans.

433.   In other words, the amounts that Northland billed to Allstate for CT scans were between 1,729% and 2,022% higher than the reasonable charge amounts established by the federal rates.

434.   The Michigan No-Fault Act requires providers like Northland to charge "a <u>reasonable amount</u> for the treatment."   Mich. Comp. Laws § 500.3157(1) (emphasis added).

435.   Charges that are more than 1,700% higher than the maximum charge permitted by the federal government cannot be reasonable under the Michigan No-Fault Act.

436.   Northland's charges are not and were not reasonable and it cannot sustain its burden of proving otherwise.

437.   Allstate is not required to pay the defendants for CT scans that were not medically necessary, were performed for the purpose of inflating claims to Allstate, and for which they did not charge Allstate a reasonable amount.

## B.   EXCESSIVE AND UNREASONABLE DRUG CHARGES

438.   Northland also billed outrageous and unreasonable amounts for the injectable drugs allegedly used in connection with pain management procedures.

439.   As detailed above, these charges often included bills for substances not actually used and not separately billable, and the extraordinary total amounts billed by Northland were a result of those fraudulent practices and the incredibly inflated amounts charged.

440.   Omnipaque, the contrast material for which Northland billed $460 per five (5) milliliter use in connection with injections, costs approximately $1 per milliliter to purchase, meaning that Northland billed more than 90 times its cost on each occasion.

441.   Lidocaine, the local anesthetic for which Northland fraudulently billed $600 per three (3) milliliter use, also costs approximately $1 per milliliter to purchase, meaning that Northland billed approximately 200 times its cost on each occasion.

442.   Other substances allegedly injected, including bupivacaine and Kenalog, were charged with similar exponentially inflated charges that had no basis and were done only to maximize the amount realized by the defendants through their fraudulent and unnecessary charges.

### C.    EXCESSIVE AND UNREASONABLE CHARGES FOR DRUG TESTING

443. As previously discussed, defendant Pioneer routinely billed Allstate for both presumptive and definitive drug testing that was not medically necessary and that was never actually ordered.

444. Pioneer also charged exorbitant and unreasonable amounts for the testing it allegedly performed.

445. Since 2020, Pioneer has billed Allstate for allegedly performing presumptive drug testing using CPT code 80307 ("Drug test(s), presumptive, any number of drug classes, any number of devices or procedures; by instrument chemistry analyzers, e.g., utilizing immunoassay, chromatography, and mass spectrometry either with or without chromatography") at least 307 times.

446. Each time it billed Allstate for presumptive drug testing, Pioneer charged $1,000.

447. By way of comparison, the federal government payment rate for presumptive drug testing billed using CPT code 80307 was just $62.14, meaning that Pioneer's charges to Allstate were 1,509% higher than the amount the federal government will pay for presumptive drug testing properly billed using CPT code 80307.

448.   Charges for drug testing that are more than 1,500% higher than federal payment rates cannot possibly be considered "reasonable," and the defendants cannot sustain their burden of proving otherwise.

449.   Pioneer charged the outrageous amounts described herein, in part, because it monetized its charges before it ever collected payment from insurers.

450.   Pioneer Lab entered into contracts through which it sold its accounts receivable (i.e., the bills submitted to Allstate) to third parties for a fraction of the amount it sought to obtain from Allstate.

451.   Pioneer's accounts receivable were sold or assigned to several different entities, including Genesis Alternative Finance IV, LLC and AKF, Inc.

452.   Allstate is not required to pay the defendants for drug testing fraudulently ordered and billed pursuant to a predetermined treatment protocol, that was never actually ordered, or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent billing submitted by Pioneer.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

453.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were

necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

454.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

455.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

456.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

457.   There are no less than nine (9) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

      a.  The defendants routinely billed for services that were not performed at all;

      b.  The defendants forged, fabricated, and exaggerated patient records to create the appearance of lawfulness and medical necessity of their claimed services;

c. The defendants improperly and unlawfully allowed laypersons to control and direct medical treatment, both through ownership and management of the clinics and through their personal injury attorney associates;

d. The defendants double billed for purported services and for components of such purported services that were not separately billable;

e. The defendants' alleged treatments and testing were based on false and fabricated diagnoses of injuries that did not exist;

f. The defendants' alleged treatments and testing were excessive and not medically necessary;

g. The defendants' alleged treatments were based on a predetermined treatment protocol that had no relation to patients' alleged injuries, if any, and were selected solely to maximize charges to insurers like Allstate;

h. The defendants used several fraudulent billing techniques, including upcoding, double billing, improper CPT code modifiers, and billing during global surgery periods; and

i. The defendants billed for alleged services at exorbitant rates that they were aware were unreasonable within the meaning of the No-Fault Act and therefore were not compensable.

458. As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

459. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

460. The foregoing facts – including billing for services not rendered, falsifying records, layperson direction of treatment, fraudulent billing, and misrepresenting the necessity of treatment – were not, and could not have been,

known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

461.  The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the alleged treatment by the defendants unnecessary and unlawful.

462.  The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 and 2.

463.  Thus, each claim for payment (and accompanying submissions) under Michigan's No-Fault Act mailed and faxed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

464.  Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

465.  Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via faxes and the U.S. Mail, the defendants

attested to the fact, lawfulness, and medical necessity of the services for which they billed Allstate.

466.   As the defendants did not render lawful and reasonably necessary treatment, and misrepresented the treatment purportedly performed, each bill and accompanying documentation mailed and faxed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

467.   The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

468.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

469.   These misrepresentations include submitting false medical documentation, including HICFs, falsely representing to Allstate the fact, lawfulness, and necessity of medical treatment and services in order to seek payment under Michigan's No-Fault Act.

470.   As a result of the defendants' misrepresentations, Allstate paid money to the defendants and incurred expenses investigating the defendants and adjusting the defendants' insurance claims to Allstate's detriment.

471.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the services billed.

472.   As a result, Allstate has incurred costs in adjusting the insurance claims submitted by the defendants and paid money to the defendants as a result of the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.  MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

473.   As discussed above, the services billed by the defendants were not medically necessary, were unlawful, were fraudulently billed, and frequently were not provided at all.

474.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 and 2, was to collect No-Fault benefits to which the defendants were not entitled because the services provided, if at all, were not necessary, were not lawfully rendered, and were fraudulently billed.

475.   This objective necessarily required the submission of bills for payment to Allstate.

476.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail

matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

477. All medical records and bills submitted through interstate wires were faxed from the defendants in Michigan and Texas to Allstate in Illinois and Ohio.

478. Allstate received all medical records and bills faxed to it by the defendants in Illinois and Ohio.

479. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

480. It was foreseeable to the defendants that submitting bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

481. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

482. The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

483. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 3.

484.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

485.   It was within the ordinary course of business for the defendants to submit claims for No-Fault payment to insurance carriers like Allstate through faxes or the U.S. Mail.

486.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via faxes or the U.S. Mail.

487.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the entity defendants.

488.   The entity defendants, at the direction and with the knowledge of their owners and managers (including defendants Krpichak and Gandhi), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

489.   Thus, the defendants' commission of mail and wire fraud continues.

490.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by

seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

491.   As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

492.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 3 annexed hereto and identified in the exemplar claims above.

493.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.  **DAMAGES**

494.   The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

495.   For the reasons set forth in this Complaint, Allstate seeks compensatory damages against the defendants for the amounts Allstate has paid to them and paid because of them and their conduct, which totals millions of dollars.

496.   Every payment claimed by Allstate as damages was made by Allstate alone.

497.   Moreover, every payment made by Allstate derives from a check sent by Allstate to the defendants through the U.S. Mail.

498.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed and faxed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

499.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

500.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Northland Enterprise)**
**Against Pioneer Lab Houston LP , Milan Gandhi, and Benjamin Krpichak**

501.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

502.   Northland constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

503.   In connection with each of the claims identified in the within Complaint, defendants Pioneer, Gandhi, and Krpichak ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false submissions by Northland, or knew that such false submissions would be faxed and mailed in the ordinary course of Northland's business, or should have reasonably foreseen that the faxing and mailing of such false submissions by Northland would occur, in furtherance of the scheme to defraud.

504.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those faxes and mailings identified in the chart annexed hereto at Exhibit 3.

505.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for alleged medical services that were purportedly performed by Northland, which they knew would be billed by Northland, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

506.   Defendant Gandhi owned, managed, and controlled Northland and was responsible for all actions taken by Northland and its staff.

507.   Defendant Krpichak instituted Northland's predetermined protocol, signed orders for unnecessary tests, and ordered and claimed to perform unnecessary services for which Northland billed.

508.   Defendant Pioneer generated medical records in response to forged and otherwise improper requisition/prescription forms to create the appearance that patients of Northland were more injured and needed more testing and services than they actually required.

509.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Northland to continue billing for unlawful and medically unnecessary treatment.

510.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Northland for the benefit of the Count I defendants that would not otherwise have been paid.

511.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

512.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT II</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Enterprise)**
**Against Pioneer Lab Houston LP, Milan Gandhi, and Benjamin Krpichak**

513.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

514.   Defendants Pioneer, Gandhi, and Krpichak ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Northland.

515.   The Count II defendants each agreed to further, facilitate, support, and operate the Northland enterprise.

516.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

517.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Northland even though Northland was not eligible to collect such payments by virtue of its unlawful conduct.

518. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

519. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

520. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Pioneer Enterprise)**
**Against Northland Radiology, Inc., Milan Gandhi, and Benjamin Krpichak**

521. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

522. Pioneer constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

523. In connection with each of the claims identified in the within Complaint, defendants Northland, Gandhi, and Krpichak ("Count III defendants")

intentionally caused to be prepared, faxed, and mailed false submissions by Pioneer, or knew that such false submissions would be faxed and mailed in the ordinary course of Pioneer's business, or should have reasonably foreseen that the faxing and mailing of such false submissions by Pioneer would occur, in furtherance of the scheme to defraud.

524.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those faxes and mailings identified in the chart annexed hereto at Exhibit 3.

525.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for alleged medical services that were purportedly performed by Pioneer, which they knew would be billed by Pioneer, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

526.   Defendants Northland, Gandhi, and Krpichak instituted protocols and made orders for drug testing that allowed Pioneer to bill for drug testing services that were not rendered, were fraudulently billed, and were medically improper and unnecessary as detailed above.

527.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Pioneer to continue billing for unlawful and medically unnecessary treatment.

528.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Pioneer for the benefit of the Count III defendants that would not otherwise have been paid.

529.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

530.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Pioneer Enterprise)
**Against Northland Radiology, Inc., Milan Gandhi, and Benjamin Krpichak**

531. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

532.   Defendants Northland, Gandhi, and Krpichak ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Pioneer.

533.   The Count IV defendants each agreed to further, facilitate, support, and operate the Pioneer enterprise.

534.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

535.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Pioneer even though Pioneer was not eligible to collect such payments by virtue of its unlawful conduct.

536.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

537.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf

of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## COMMON LAW FRAUD
### Against All Defendants

538.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

539.   The scheme to defraud perpetrated by Northland, Pioneer, Gandhi and Krpichak ("Count V defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

540.   The misrepresentations of fact made by the Count V defendants include those material misrepresentations discussed in section XI.A, *supra*.

541.   The Count V defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

542.   The misrepresentations were intentionally made by the Count V defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, and knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

543.    The Count V defendants' misrepresentations were known by them to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

544.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to and in incurring expenses related to the adjustment and processing of insurance claims submitted by the defendants.

545.    As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described above.

### COUNT VI
### CIVIL CONSPIRACY
### Against All Defendants

546.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

547.    Defendants Northland, Pioneer, Gandhi and Krpichak ("Count VI defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical

treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

548.    The Count VI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

549.    This purpose was known to all of the Count VI defendants and intentionally pursued.

550.    Indeed, as detailed above, the Count VI defendants engaged in a coordinated plan to bill Allstate for not performed, unnecessary, improper, and excessive treatments that were never compensable under Michigan's No-Fault Act.

551.    Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count VI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

552.    In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

553.   All of the Count VI defendants directly benefited from the payments made to Pioneer and Northland.

554.   All of the Count VI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count VI defendants in the commission of acts done for the benefit of all Count VI defendants and to the unjustified detriment of Allstate.

555.   Accordingly, all of the Count VI defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT VII**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Northland Radiology, Inc. and Pioneer Lab Houston LP**

556.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

557.   Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Northland and Pioneer ("Count VII defendants").

558.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count VII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly provided and whether the patient's injury arose out of a motor vehicle accident.

102

559.  The Count VII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

560.  Allstate is entitled to restitution from each of the Count VII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

561.  The Count VII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT VIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

562.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

563.  Defendants Northland, Pioneer, Gandhi and Krpichak ("Count VIII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money to them, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

564.  Allstate's payments constitute a benefit that the Count VIII defendants aggressively sought and voluntarily accepted.

565.  The Count VIII defendants wrongfully obtained or benefited from payments from Allstate through the wrongful conduct detailed herein.

566.  The Count VIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT IX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

567.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 500 set forth above as if fully set forth herein.

568.  Defendants Northland, Pioneer, Gandhi and Krpichak ("Count IX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

569.  The Count IX defendants also routinely billed for services not rendered.

570.  The Count IX defendants billed for services pursuant to a scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating bills to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

571.  Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

572.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

573.   The lack of lawfully rendered treatment (such as treatment arising from illegal solicitation and inducements) is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws §§ 500.3157(1).

574.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

575.   The Count IX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

576.   The Count IX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously denied insurance claims submitted by any of the Count IX defendants for any or all of the reasons set out in the within Complaint.

577.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count IX defendants billed for

unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

578. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count IX defendants billed Allstate for unnecessary and unlawful treatment and treatment not provided at all relevant times.

579. As such, the Count IX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count IX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

580. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count IX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XV. <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**<u>COUNT I</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Northland Enterprise)**
**Against Pioneer Lab Houston LP , Milan Gandhi, and Benjamin Krpichak**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**<u>COUNT II</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Enterprise)**
**Against Pioneer Lab Houston LP , Milan Gandhi, and Benjamin Krpichak**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just

### COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Pioneer Enterprise)
### Against Northland Radiology, Inc., Milan Gandhi, and Benjamin Krpichak

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Pioneer Enterprise)
### Against Northland Radiology, Inc., Milan Gandhi, and Benjamin Krpichak

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems jus

## COUNT V
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT VI
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

### COUNT VII
### PAYMENT UNDER MISTAKE OF FACT
**Against Northland Radiology, Inc. and Pioneer Lab Houston LP**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

### COUNT VIII
### UNJUST ENRICHMENT
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

### COUNT IX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously denied insurance claims submitted by Northland Radiology, Inc., Pioneer Lab Houston LP, Milan Gandhi, and Benjamin Krpichak, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE Northland Radiology, Inc., Pioneer Lab Houston LP, Milan Gandhi, and Benjamin Krpichak, jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or

any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE Northland Radiology, Inc., Pioneer Lab Houston LP, Milan Gandhi, and Benjamin Krpichak, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan and federal law and the principles of equity.

## XVI.   **JURY DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____
Andrew H. DeNinno (P87678)
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated: October 21, 2024        *Attorneys for Plaintiffs*

111